IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>GARY GREATHOUSE,<br><br>　　　　Defendant. | No. CR10-0048<br><br>REPORT AND RECOMMENDATION |

TABLE OF CONTENTS

I.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . 2

III. RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.  DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     A.   Was Defendant Given A Miranda Warning?. . . . . . . . . 6
     B.   Was Defendant In Custody?. . . . . . . . . . . . . . . . . . . 8

V.   RECOMMENDATION. . . . . . . . . . . . . . . . . . . . . . . 13

I. INTRODUCTION

On the 6th day of July 2010, this matter came on for hearing on the Motion to Suppress (docket number 12) filed by the Defendant on June 25, 2010. The Government was represented by Assistant United States Attorney Daniel C. Tvedt. Defendant Gary Greathouse appeared personally and was represented by his attorney, Jill M. Johnston.

## II. PROCEDURAL HISTORY

On June 9, 2010, Defendant Gary Greathouse was charged by Indictment with one count of manufacture and aiding and abetting the manufacture of methamphetamine within 1,000 feet of a school. Defendant entered a plea of not guilty and trial was scheduled for August 9, 2010 before Chief Judge Linda R. Reade. On June 25, 2010, Defendant timely filed the instant motion to suppress.

## III. RELEVANT FACTS

On January 21, 2010, officers with the Iowa Division of Narcotics Enforcement ("Iowa DNE") and the Muscatine County Drug Task Force executed a search warrant at the residence of Scott Bishop in Clarence, Iowa. While the search was being conducted, Bishop told Special Agent Daniel Stepleton of the Iowa DNE that he was aware of other persons manufacturing methamphetamine in the Clarence area. Stepleton and Bishop drove through the alley behind Defendant's residence, and Bishop pointed out Defendant's house and garage. Bishop also identified the residence of Mark Meyer across the street.

At approximately 7:00 p.m., after the search of Bishop's house was completed, the officers decided to drive to Defendant's residence and attempt to gain consent to search the premises. Nine officers proceeded to Defendant's residence, parking in the alley behind the house. In approaching the house, Special Agent Stepleton stopped briefly at the garage. The garage door was "slightly ajar" and the light was on. Stepleton knocked on the garage door and "kept announcing police," but did not receive any response. The officers then proceeded to the back door of the house.[1]

Defendant responded to Special Agent Stepleton's knock on the back door of the residence. Stepleton displayed a badge hanging from a neck chain and identified himself as "a special agent with state narcotics." Stepleton advised Defendant that they were

---

[1] After arriving at the house, Special Agent Stepleton was advised by Special Agent Jessie Whitmer "not to go back to the garage area because there was a very strong odor of anhydrous ammonia that was emanating from the garage." According to Stepleton, "I have no sense of smell anymore."

2

conducting an investigation, had just come from Bishop's residence, and that Bishop told officers that Defendant was involved in manufacturing methamphetamine. According to Stepleton, Defendant then "advised me to come in."

As Special Agent Stepleton entered the residence, Defendant "took off at a real fast walk toward the kitchen area." By the time Stepleton got to the kitchen, Defendant "was just walking in a bathroom that was just off of the kitchen area and then he had closed the door." Stepleton asked Defendant what he was doing, and Defendant responded that there was another person in the bathroom and he "was just letting them know we were there."

It appeared to Special Agent Stepleton that Defendant had been eating dinner when they arrived. After Defendant exited the bathroom, Stepleton "advised him to go ahead and be seated again if that made him comfortable." Stepleton then sat with Defendant at the kitchen table and started discussing the investigation.[2] Stepleton told Defendant that they had just finished a search at Bishop's residence and had found items associated with the manufacture of methamphetamine. Stepleton advised Defendant that Bishop had implicated Defendant in the manufacture of methamphetamine. Stepleton told Defendant that one of the officers smelled anhydrous ammonia when they walked by his garage. Stepleton then asked Defendant if he would consent to a search of his residence.

According to Special Agent Stepleton, "Mr. Greathouse did not have a problem consenting to us walking around the residence and looking for items as long as he could be present and walk with us." When Stepleton presented Defendant with a consent to search form, however, Defendant told Stepleton that "he wasn't going to sign a consent search form because the last time he signed something like that he had to go to prison."

At about the same time, Special Agent Stepleton asked Defendant whether he would sign a *Miranda* warning form. Again, Defendant refused to sign. Stepleton testified, however, that he placed the form in front of Defendant and read it to him. Stepleton did

---

[2] After "a minute or so," an individual identified as Daniel Ball exited the bathroom. Ball was escorted by other officers to the living room.

3

not fill out either form or write "refused to sign" at the bottom. Since Defendant had already said he would not sign the forms, Stepleton believed that filling out either form "would be a waste of my time."

Defendant then accompanied officers to the basement of the residence. No contraband was found in the basement. Defendant and the officers then went to the garage. Officers found some Coleman cans and a large 55 to 60-gallon drum which contained "some residual liquid in the bottom." A piece of pH paper dropped in the container by officers turned a greenish blue, indicating the presence of anhydrous ammonia. After looking in the garage, Special Agent Stepleton and Defendant returned to the kitchen table.

After being seated in the kitchen, Special Agent Stepleton asked Defendant if he could look in the bathroom, which was off the kitchen and approximately five feet from where Defendant was sitting. Defendant said "yeah, that's fine, go in." After taking a quick look through the medicine cabinet, Special Agent Stepleton raised the top tank of the toilet and noticed three small Ziploc bags containing a white powdery substance, resembling methamphetamine. Stepleton retrieved the bags and placed them on the kitchen table. Defendant denied any involvement in the contraband and told officers that he believed they belonged to Daniel Ball.

By this time, Special Agent Stepleton learned that Ball had told another detective that anhydrous ammonia was being stored across the street in the garage. This information was consistent with the statement by Bishop that items related to the manufacture of methamphetamine could be found at the residence of Mark Meyer. At that point, it was decided that Stepleton and Special Agent Whitmer would seek out Meyer and attempt to gain consent to search his residence. Accordingly, Stepleton asked Detective Thomas McGuinty of the Cedar County Sheriff's Office to interview Defendant.

Detective McGuinty testified that he was not in the kitchen area when Special Agent Stepleton gave Defendant a *Miranda* warning. According to McGuinty, he did not

4

*Mirandize* Defendant because "to me it was a non-custodial interview." The questioning proceeded with McGuinty and Defendant sitting at the kitchen table. Also present for the interview was Sergeant Ardyth Orr of the Muscatine County Sheriff's Office. Special Agent Chad Page of the Iowa DNE was present for a portion of the interview.

Detective McGuinty's initial interview with Defendant began at approximately 7:30 p.m. While the Cedar County Attorney apparently has a policy that officers "try to record all interviews," McGuinty apparently did not think to do so initially. Instead, McGuinty took notes while questioning Defendant. After the first phase of the interview was completed, however, McGuinty asked Special Agent Page whether he could borrow his recorder. A recorded interview then began at approximately 8:49 p.m. According to McGuinty, during the second interview he "just went through the notes" he had taken in the first interview. The second interview concluded at 9:16 p.m. When Defendant learned that Daniel Ball was cooperating with authorities, however, Defendant wanted to provide additional information. A third interview (also recorded) began at 9:22 p.m. and was concluded at 9:31 p.m.[3]

According to Detective McGuinty, Defendant was not handcuffed or restrained in any way during the interview. McGuinty testified that Defendant was permitted to smoke during the interview and, in fact, Defendant's wife came into the kitchen and provided Defendant with either a cigarette or a lighter. According to McGuinty, Defendant's wife came in on another occasion and provided him with a glass of water or a soda. It should be noted, however, that Defendant's wife, Alicia Fowler, denied either of the contacts described by McGuinty.[4]

---

[3] A CD of the second and third interviews was introduced at the hearing as Government's Exhibit 1. A transcript of the second and third interviews was introduced as Government's Exhibit 1A.

[4] Ms. Fowler is apparently Defendant's common-law wife of 18 years, and they have three children together (ages 13, 11, and 2).

5

After the third interview was concluded, Detective McGuinty told Defendant that he could go to the living room and sit with his wife and children. McGuinty then went to the Meyer residence, where he discussed the investigation with Special Agents Stepleton and Whitmer. At approximately 10:00 p.m., McGuinty called the Cedar County Attorney to describe what had transpired that evening. The Cedar County Attorney's Office has a verbal policy that if officers are investigating a "serious case," the County Attorney's Office "wants to be abreast of what's taking place before anybody is taken into custody." According to McGuinty, he was told by the County Attorney to arrest Defendant and Ball. McGuinty then returned to Defendant's residence, where he was placed under arrest and transported to the jail.

## IV. DISCUSSION

Defendant asks that all statements made by him to law enforcement on January 21, 2010, be suppressed "on the grounds that he was not advised of his *Miranda* rights prior to being interrogated."[5] The Government resists the motion on both factual and legal grounds, asserting Defendant *was* given a *Miranda* warning, and arguing further that a *Miranda* warning was not required in any event because Defendant was not in custody.

### A. Was Defendant Given A Miranda Warning?

Defendant's motion to suppress is premised on the factual assertion that "there is no evidence that Defendant was ever read his *Miranda* rights prior to questioning by law enforcement officers."[6] Defendant did not sign a form waiving his *Miranda* rights, there is no form indicating Defendant "refused to sign," none of the officer's reports reflect that Defendant was advised of his *Miranda* rights, and the recording of the interview with Defendant does not refer to a *Miranda* warning. The Government asserts, however, that

---

[5] *See* Defendant's Motion to Suppress (docket number 12).

[6] *See* Defendant's Brief in Support of Motion to Suppress (docket number 12-1) at 3.

6

notwithstanding the lack of any documentary evidence that Defendant was *Mirandized*, the testimony of Special Agents Stepleton and Page establish that the warning was given.

Special Agent Stepleton testified under oath at the instant hearing that he placed the *Miranda* waiver form in front of Defendant and told him that he was going to fill it out. According to Stepleton, Defendant "said I'm not going to sign anything and I said fine, I'm just going to read this to you and he had no problem with that." Stepleton testified that he did not take notes during his interaction with Defendant, or prepare a report regarding that interaction, because he was not the officer who interviewed Defendant. According to Stepleton, "I was obtaining consent to search and Miranda, which is totally different."

Special Agent Chad Page testified that he retrieved the *Miranda* waiver form from his vehicle. In fact, Page made a second trip to his vehicle, after he mistakenly brought in two consent-to-search forms on his first trip. Page testified under oath at the instant hearing that he was present when Special Agent Stepleton covered the *Miranda* form with Defendant. On Cross-examination, Page acknowledged that while his report indicates that Defendant gave consent to search but refused to sign a consent-to-search form, his report makes no reference anywhere to Defendant being given his *Miranda* rights, or refusing to sign the *Miranda* waiver form. Similarly, the recorded portion of Defendant's interview reflects Defendant's verbal consent to search, but makes no reference to any *Miranda* warning.

A resolution of this factual issue requires the Court to evaluate the credibility of Special Agents Stepleton and Page. Defendant relies on the fact that there is no form, report, or recording which refers to Defendant being *Mirandized*. At the instant hearing, however, Stepleton and Page testified specifically that the *Miranda* waiver form was retrieved from Page's vehicle, was placed in front of Defendant and read him by Stepleton, and Defendant refused to sign. The Court finds that the testimony, given under penalty of perjury, was credible.

7

Having found that Defendant was given a *Miranda* warning, the Court concludes that Defendant's motion to suppress fails. That is, the foundation of Defendant's motion is that no *Miranda* warning was given. Defendant does *not* claim, for example, that he asserted his right to remain silent after being given a *Miranda* warning. *See, e.g., Berghuis v. Thompkins*, ___ U.S. ___, 130 S. Ct. 2250, 2262 (2010) ("Where the prosecution shows that a *Miranda* warning was given and that it was understood by an accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."). Similarly, Defendant does not make a generalized claim that his statements were involuntary, despite a *Miranda* warning. *See, e.g., United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) ("A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination."). Accordingly, I recommend that the district court deny the motion to suppress on this factual basis.

### B. Was Defendant In Custody?

The Government argues that even if a *Miranda* warning was *not* given prior to the interview with Defendant, none was required because Defendant was not in custody. As set forth above, I find, as a factual matter, that a *Miranda* warning was given to Defendant. Accordingly, I do not believe that it is necessary for the district court to answer this question. In the event that the district court disagrees with my findings of fact, however, the Court will address this issue.

In his brief, Defendant concedes that "a person has [to] be both in custody and interrogated in order for the protection afforded under *Miranda* to apply."[7] That is, "law enforcement officials must administer *Miranda* warnings before interrogating individuals in their custody." *United States v. Elzahabi*, 557 F.3d 879, 883 (8th Cir. 2009). However, "the task of defining 'custody' is a slippery one." *United States v. Mottl*, 946

---

[7] *See* Defendant's Brief in Support of Motion to Suppress (docket number 12-1) at 3.

8

F.2d 1366, 1369 (8th Cir. 1991) (quoting *Oregon v. Elstad*, 470 U.S. 298, 309 (1985)). The "ultimate inquiry" in determining whether a suspect is in custody is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983).

In *United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990), the Court identified six "indicia of custody" to consider in determining whether a custodial interrogation occurred:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Id.* at 1349 (cited with approval in *Elzahabi*, 557 F.3d at 883). "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of sentencing." *United States v. Axsom*, 289 F.3d 496, 500-01 (8th Cir. 2002). "Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." *Id.* at 501.

Turning to the first indicium of custody identified in *Griffin*, there is no evidence that Defendant was specifically told that the questioning was voluntary, or that he could request the officers to leave his home. According to Special Agent Stepleton, however, Defendant repeatedly asked whether he was under arrest, and was told on each occasion that he was not under arrest. Stepleton testified that Defendant "told me that he would cooperate with us and he kept asking me 'am I under arrest,' and I kept telling him 'you're not under arrest and you're not even in custody, we're just here doing an investigation.'"

9

The second *Griffin* indicium of custody requires a determination of whether Defendant's freedom of movement was restrained during questioning. After accompanying officers on a consent search of his basement and garage, Defendant was seated at his kitchen table. Defendant was not handcuffed or placed in any formal restraints. Defendant was permitted to smoke during the interview, and a preponderance of the credible evidence established that Defendant's wife provided him with a cigarette or a lighter. On another occasion, Defendant's wife provided him with a glass of water or a soda.[8] Defendant's children returned home midway during the process, and apparently one of his children gave him a hug while he was seated at the kitchen table.

Regarding the third indicium of custody identified in *Griffin*, Defendant did not initiate contact with authorities, but invited them into his home when they appeared and asked to speak with him about their investigation into the manufacture of methamphetamine. Defendant admits that he consented to a search of his residence and garage.[9] In addition, Defendant agreed to answer the officers' questions, although he refused to sign a written waiver of his *Miranda* rights. At no time did Defendant refuse to respond to questions or otherwise indicate to law enforcement officers that he wanted the questioning to cease.

Regarding the fourth indicium of custody identified in *Griffin*, there is no evidence that law enforcement officers used "strong arm tactics or deceptive stratagems." Special Agent Stepleton advised Defendant why they were there at the beginning of the encounter. Specifically, Defendant was told that the officers had completed a search of the Bishop residence, and that Bishop had implicated Defendant in the manufacture of

---

[8] While Defendant's wife testified that she did not have any contact with Defendant while he was in the kitchen, the recording of the interview reflects that Defendant said "I love you girl," and a female voice can be heard saying "I love you too." *See* Government's Exhibit 1A at 11.

[9] *See* Government's Exhibit 1A at 13.

methamphetamine. Defendant was also advised that officers smelled the odor of anhydrous ammonia emanating from his garage. The recording of the interview with Defendant reflects that the questioning was conversational in tone. The officers did not raise their voices or otherwise attempt to intimidate Defendant.

The fifth indicium of custody identified in *Griffin* requires the Court to determine "whether the atmosphere of the questioning was police dominated." There were nine officers who participated in the search at Defendant's residence. According to Special Agent Stepleton, however, "we were pretty scattered out." The interview of Defendant was conducted by Detective McGuinty, with Sergeant Orr sitting in. Special Agent Page was also present for a part of the interview. The interview took place in the kitchen of Defendant's home and the Court cannot say that it was "police dominated."

Finally, the sixth indicium of custody identified by *Griffin* is whether the suspect was placed under arrest at the termination of the questioning. In this case, Defendant was arrested shortly after the interview was concluded.

I believe that the first five indicia identified in *Griffin* suggest Defendant was not in custody, while the sixth indicium suggests that he was in custody. However, the *Griffin* factors are non-exhaustive and are not to be mechanically applied. *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004). A determination of whether a person is in custody for these purposes "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *United States v. Martin*, 369 F.3d 1046, 1056 (8th Cir. 2004) (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)). Accordingly, the Court must determine, based on "a totality of circumstances," whether Defendant was "in custody" when he was questioned by Detective McGuinty.

The Eighth Circuit's holding in *United States v. Axsom*, 289 F.3d 496 (8th Cir. 2002), is instructive here. There, nine federal agents entered the defendant's home at 6:45 a.m. to execute a search warrant. The defendant was "directed to sit down" while

11

the warrant was being executed. Over the course of the next hour, two of the federal agents interviewed the defendant. When the defendant stood up to get a drink, he was instructed to "hold on just a minute" and another agent was then directed to bring the defendant a glass of water. When defendant expressed his need to use the bathroom, an agent "escorted him for security reasons." The district court concluded that the defendant was in custody and, because no *Miranda* warning was given, his statements were inadmissible. However, the Eighth Circuit Court of Appeals reversed. Among other things, the Court found that "[w]hen a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial." *Id.* at 502.

Also instructive is *United States v. Czichray*, 378 F.3d 822 (8th Cir. 2004). There, FBI agents approached defendant's home at 6:30 a.m. and told the defendant that "they would like to speak with him for a few minutes." *Id.* at 825. Defendant was told that he need not speak with the agents. The defendant admitted the agents into his home and was questioned over the course of the next seven hours. When the defendant moved about his home on two occasions to go to the bathroom and his bedroom, the defendant was accompanied by an agent. The defendant did not resist the agents' questioning during the interview, and he never asked them to leave. The district court found that the defendant was in custody during the interrogation, and that the failure to give a *Miranda* warning rendered the defendant's statements inadmissible. The Eighth Circuit Court of Appeals reversed, however, concluding that Czichray was not in custody. The Court noted that "[w]hen a person is questioned 'on his own turf,' we have observed repeatedly that the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'" *Id.* at 826.

After considering all of the facts and circumstances, I believe that Defendant was not in custody when he was interviewed by Detective McGuinty. Defendant was not under formal arrest at that time, and his freedom was not restricted to the degree associated with

formal arrest. *Beheler*, 463 U.S. at 1125. Accordingly, the law enforcement officers were not obligated to provide Defendant with a *Miranda* warning prior to questioning. (Although, as set forth above, the Court believes that a *Miranda* warning was given.)

## V. RECOMMENDATION

For the reasons set forth above, it is respectfully **RECOMMENDED** that the district court **DENY** the Motion to Suppress (docket number 12) filed by Defendant on June 25, 2010.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on July 6, 2010.*

DATED this 12th day of July, 2010.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA